NUMBER 13-03-290-CR



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG







LEONCIO LOZANO
, Appellant,


v.



THE STATE OF TEXAS, Appellee.





On appeal from the 398th District Court


of Hidalgo County, Texas.






MEMORANDUM OPINION (1)



Before Chief Justice Valdez and Justices Yañez and Castillo


Opinion by Justice Castillo



 A jury convicted appellant Leoncio Lozano of capital murder of a child. (2) The trial
court assessed the automatic life sentence. By three points of error, Lozano asserts
(1) the trial court harmed him by creating in the jury's presence a hostile environment
toward his defense, and (2) the evidence is legally and factually insufficient to sustain
the conviction. We affirm. 

I. BACKGROUND

 At the time of his death, Johnathan Cate was twenty months old and weighed
twenty-four pounds. He died from two intestinal ruptures and a mesentery rupture
caused by multiple, blunt trauma to his abdomen. He sustained bite marks above the
groin (3) and bruises and lacerations to his face, abdomen, back, legs, one toe, (4) and his
groin. The injuries were in various stages of healing. The child had four bruises on the
left side of his abdomen and three on the right side of his abdomen. Most were fresh. 
A large bruise on his back was also fresh. Johnathan was the child of Lozano's then
girlfriend, Crystallyn Lozano. (5) Lozano testified that he accidentally stepped on the
child. Medical testimony showed that the child's injuries were not caused by stepping
on him. Evidence showed that Lozano was the only adult present when the child
sustained the fatal injuries. Events leading to Johnathan's death unfolded as follows. 

A. The State's Evidence

 Crystallyn Lozano (hereafter "Mrs. Lozano") met Lozano in an internet chat
room. At the time, Mrs. Lozano and Johnathan were living with her mother. Over a
month later, in August 2001, Lozano moved in with them. In early October, Lozano
moved Mrs. Lozano and Johnathan out. By early December, they moved to a house
across the street from his parents' house. In early December, Mrs. Lozano secured
work at a local department store. Her work day usually began at 6:00 p.m. Most
days, Mrs. Lozano spent her time with Johnathan at Lozano's parents' house across
the street. Five days before Johnathan's death, the child's maternal grandmother
observed that the child had several bruises and cried over an hour without stopping. 
She also observed that she could not comfort him. She testified that he was not a
fussy child. 

 On December 22, 2001, Lozano's parents took Mrs. Lozano to work at about
7:00 p.m. When Mrs. Lozano worked, Johnathan stayed with Lozano's parents. At
approximately 8:30 p.m., Lozano arrived at his parents' home from work. He
remained there until 10:30 p.m. and then took Johnathan home with him. Lozano had
been in charge of toilet training the child. 

 The following recounts Lozano's statement to police. Once home, Lozano
placed the child on the toilet and then in the shower. While Johnathan was in the
shower, Lozano shaved. Lozano then clipped the child's toenails and fingernails. He
left the child in his room playing. A gate was always in the doorway of Johnathan's
room to prevent him from wandering out. Johnathan joined Lozano in his room and
climbed onto his bed. For about an hour, the two watched television. During the
same time, Lozano began to get clothes ready to wash. Meanwhile, Johnathan went
to his room and fell asleep. Ordinarily, the child slept on a mat on the floor in his own
room. Lozano washed clothes and continued watching television. At about 1:40
a.m., he awoke Johnathan because it was time to pick up Mrs. Lozano from work. 
Johnathan stood up. In his statement to police, Lozano continued:

 I walked back to the laundry room to get more clothes, and when I
walked back to Johnathan's room I stepped across the baby gate. The
baby gate is by the doorway. I stepped across barefoot and accidentally
stepped on Johnathan as I walked across. I stepped on his stomach and
I heard him gasp. I picked him up and he looked fine. He never cried. 
I carried him over to my bed and started putting on his clothes. While I
was doing this I noticed that he started to look bad. I tried to raise him
up, but he would fall back over. I decided that something was wrong. 
So I took Johnathan over to my parents' house. I told them to call the
ambulance. . . . I heard the ambulance coming, so I got in my truck and
drove over to Wal-Mart to pick up Crystallyn . . . and drove back home. 
The ambulance was still there. . . . I told Crystallyn that Johnathan was
sick. I did not tell her that I accidentally stepped on him. From the time
I stepped on Johnathan until I got my parents to call the ambulance I say
would be about 30 minutes. 


Johnathan died at the scene. (6) Efforts to resuscitate him, prior to and after his arrival
at the hospital, failed. Medical reports admitted in evidence show he was dead at the
scene by the time emergency personnel arrived at 2:09 a.m. Dr. Heriberto Alanis, the
emergency room physician, testified he estimated that the child had been dead over
an hour. He testified that the child sustained "trauma that kills." As to the bruise on
the child's lower back, he testified that "there had been recent trauma," somewhere
between an hour and two hours earlier. Dr. Alanis opined that, in order for an intestine
to rupture, there had to be a significant to severe amount of trauma. A rupture could
result from a kick or strike to the abdomen. The child may have been punched, kicked,
or thrown. Stepping on the child's abdomen would not have caused his injuries. A
child with a ruptured intestine would be in excruciating pain. Dr. Alanis further
testified that the injury to the large toe was recent and significant enough that "a
caretaker would have sought medical attention for it." The freshest injuries were the
ones on the child's abdomen and lower back. The marks on his back could have been
boot marks. The child's groin was "scraped." Although there was trauma to it, Dr.
Alanis did not know how it occurred or who inflicted it. 

 Dr. R. V. Reddy, Johnathan's pediatrician, testified that he last saw the child on
December 30, 2000, for a cold. He testified that a rupture to the intestine could be
caused by stepping and "anything can cause a ruptured viscus." From the child's
medical records, he further testified that "it is a blunt injury that causes the rupture." 
He testified that the urethra of the groin was "coming out which is rare." He
described the injury as appearing to be a blunt force injury. 

 Dr. Fulgencio Salinas, who performed the autopsy, testified, "It requires a lot
of force to be able to bust a fairly stable intestinal tract, so the hit that occurs has to
be of considerable force." The child's mesentery was also bleeding. He added, "It
requires a lot of force, probably even more than the intestine, to be able to rupture the
mesentery." He testified that the cause of death was blunt trauma to the abdomen. 
In his opinion, stepping on the child would not cause the injury. Even if someone
stepped on the child, he would not expect to find that many bruises in the abdominal
area because "these are separate bruises and stepping would not cause the blunt-type
injury inflicted." Dr. Salinas testified that the bruises on the back were also caused
by blunt trauma. A kick, or a hit, a fist, or an object would have caused the injuries. 
The child would have been moving and in pain. Regarding the toe injury, he testified
that the abrasion involved a rub and tear to the top layer of the skin. He found bruises
on the left and three on the right side of the abdomen and bite marks above the groin
area. In his opinion, all of the bruises on the child's body negated an accident. The
bruises on the child's abdomen were consistent with the trauma required to cause the
fatal ruptures. Photographs of the child before and during the autopsy show the
internal injuries, extensive bruising on his abdomen and back, bite marks, scrapes and
lacerations on his face, and the injuries to his groin and toe. 

 The jury heard that Mrs. Lozano told a co-worker she wanted to give Johnathan
away because Lozano had given her an option-Mrs. Lozano had to choose between
the child and him if she wanted to get married. The jury also heard that Mrs. Lozano
told another co-worker that she would get mad at Lozano because he would hit
Johnathan.

B. The Defense's Evidence

 Mrs. Lozano denied that she spoke with co-workers about Johnathan. She
explained that the gate across Johnathan's bedroom door was to prevent him from
getting into things because he was very active. She had also caught him trying to
open the front door and was concerned about his safety. Against the gate, she placed
two chairs loaded with boxes and books to prevent him from climbing over it. On one
occasion, he sustained bruises when he became trapped between the chairs. 

 Mrs. Lozano testified that Johnathan did not have the injury to his toe when she
left for work on December 22, 2001. He did have scratches but not the injuries on
his stomach. She testified that the injury to his back was from the chair incident. She
did not know how he sustained the other injuries pointed out in the photographs
admitted in evidence. She testified that Lozano disciplined the child. 

 Lozano's sister, Diana Moncada, testified that, at about 2:00 a.m. on December
23, 2001, Lozano walked into their parents' bedroom carrying Johnathan and said, "I
took his air out." Lozano asked her for help. She carried Johnathan and noticed he
was cold. When emergency personnel arrived at about 2:09 a.m., she told them
Lozano said, "I took his air out." She testified Lozano was not a violent person. 

 Lozano testified he bonded early with Johnathan and wanted to adopt him. 
They had lived at the residence across from his parents' home about two months
before Johnathan died. On direct, he testified as follows:

 Q. Did you intend to kill him?

 A. I didn't-I did not kill him, not intentionally.

 Q. Do you know that he died as a result of your actions? Did you intend
to step on him?


 A. No, sir.

He testified that, when he stepped over the gate and on Johnathan, it was with
momentum. When asked about the chairs in the doorway to block the gate, Lozano
testified, "When he was in the room and I was in the house, we would put two chairs
this way." On December 22, he bathed Johnathan as soon as they arrived home. 
That evening, one chair with boxes on it blocked the gate at the doorway to
Johnathan's room. He had awakened the child because it was time to pick up Mrs.
Lozano from work. Johnathan was not wearing clothes because Lozano was washing
them. Lozano left Johnathan awake and went to the laundry room. He returned about
five minutes later. Before stepping over the gate, Lozano was carrying towels he had
washed. He stated he did not know Johnathan was on the floor and he did not see
the child. He testified he did not jump on him. When he stepped on the child, Lozano
threw himself "as much as [he] could." He did not expect or know Johnathan was
going to move from where Lozano left him. The lighting was dim. He was not
wearing his glasses. When he took Johnathan to his parents, Lozano told them he had
accidentally stepped on the child.

 Lozano denied causing the bruising on the child's body. He acknowledged the
child "did have some bruising" on the occasion as testified to by the child's maternal
grandmother. When asked why he did not immediately tell Mrs. Lozano he stepped
on Johnathan, he answered he "didn't know what was-how serious, super serious,
it was right away, but I did notice that he was more of a-more limp, more-well, I
mean, he wasn't super responsive." Lozano admitted he spanked Johnathan no more
than three times. He testified he cut the child's toenails at his wife's request. As to
the toe injury, he stated, "If I nicked him-I don't remember if I nicked him, but I didn't
do that." He denied biting the child's groin. He further testified on direct examination
as follows:

 Q. But you're not denying that because of what you did by accident the
child died, are you?

 A. No, sir. I-I understand.

 Q. You accept responsibility for the actions, don't you?

 A. Yes, sir. 

On cross-examination, Lozano testified as follows:

 Q. What I want to know is why you killed him?

 A. It was an accident.

 Q. Was it because he was blonde-haired and blue-eyed and didn't look
like you?


 A. No. 

He further testified that he did jump over the gate. He then demonstrated how he
jumped over the gate. He did not know how the child sustained the bruises shown in
the pictures admitted in evidence. He further testified as follows:

 Q. Well, was there anybody else in the house with you?

 A. There was nobody else at the house.

 Q. Was there anybody else there?

 A. Only Johnathan and I.

 Q. And Johnathan is dead.

 A. Correct.

 Q. So how did he get them? You're the only one left?

 A. I wasn't there when those bruises were on him.

Lozano testified that, after stepping on Jonathan, he felt the child's stomach and it felt
mushy, and so he knew he did not step on his chest.

C. The State's Rebuttal Evidence

 The State re-called Dr. Salinas, who performed the autopsy. He testified that
the injuries were not the result of someone stepping on the child because several
bruises were present on different sides of his body, including distinct bruises in the
abdominal area that resulted from the same trauma that caused the internal ruptures. 
He added that the amount of force needed to rupture the intestinal cavity was "quite
extensive." He added that "the type of force that is required . . . is very sudden and
quick, and it raises the pressure of the abdominal cavity very quick." He added that
the bruises were of "types when you are hit or kicked" but "first of all, [accidental
stepping] wouldn't give me those patterns that I see in the abdominal cavity." He
testified that a blunt object could cause the injuries the child sustained. On cross-examination, he testified:

 Q. We're only contesting whether or not an individual intentionally did
this. Could it have been by accident?

 A. Not the pattern that I see. It's not an accident.

II. SUFFICIENCY OF THE EVIDENCE

A. Standard of Review

 In his second and third points of error, Lozano claims the evidence is legally and
factually insufficient to establish the essential elements of intent to kill and identity. 
In determining the sufficiency of the evidence, we view the evidence in the light most
favorable to the verdict to decide whether any rational trier of fact could have found
the essential elements of the crime beyond a reasonable doubt. See Salinas v. State,
163 S.W.3d 734, 737 (Tex. Crim. App. 2005) (citing Jackson v. Virginia, 443 U.S.
307, 319 (1979)); Escamilla v. State, 143 S.W.3d 814, 817 (Tex. Crim. App. 2004);
Rojas v. State, 171 S.W.3d 442, 445-46 (Tex. App.-Houston [14th Dist.] 2005, pet.
ref'd) (citing Wesbrook v. State, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000)). The
issue on appeal is not whether we, as a court, believe the State's evidence or believe
that appellant's evidence outweighs the State's evidence. Rojas, 171 S.W.3d at 445
(citing Wicker v. State, 667 S.W.2d 137, 143 (Tex. Crim. App. 1984)). The verdict
may not be overturned unless it is irrational or unsupported by proof beyond a
reasonable doubt. Id. (citing Matson v. State, 819 S.W.2d 839, 846 (Tex. Crim. App.
1991)). The jury, as the trier of fact, "is the sole judge of the credibility of the
witnesses and of the strength of the evidence." Id. at 445-46 (citing Fuentes v. State,
991 S.W.2d 267, 271 (Tex. Crim. App. 1999)). The jury may choose to believe or
disbelieve any portion of the witnesses' testimony. Id. at 446 (citing Sharp v. State,
707 S.W.2d 611, 614 (Tex. Crim. App. 1986)). When faced with conflicting
evidence, we presume the trier of fact resolved conflicts in favor of the prevailing
party. Id. (citing Turro v. State, 867 S.W.2d 43, 47 (Tex. Crim. App.1993)). 
Therefore, if any rational trier of fact could have found the essential elements of the
crime beyond a reasonable doubt, we must affirm. Id. (citing McDuff v. State, 939
S.W.2d 607, 614 (Tex. Crim. App. 1997)). This standard is meant to give "full play
to the [jury's] responsibility fairly" to "draw reasonable inferences from basic facts to
ultimate facts." Sanders v. State, 119 S.W.3d 818, 820 (Tex. Crim. App. 2003). We
consider all the evidence that sustains the conviction, whether properly or improperly
admitted. See Conner v. State, 67 S.W.3d 192,197 (Tex. Crim. App. 2001) (citing
Garcia v. State, 919 S.W.2d 370, 378 (Tex. Crim. App. 1994) (per curiam)). 

 In contrast, when evaluating a challenge to the factual sufficiency of the
evidence, we view all the evidence in a neutral light and inquire whether the jury was
rationally justified in finding guilt beyond a reasonable doubt. Rojas, 171 S.W.3d at
446 (citing Zuniga v. State, 144 S.W.3d 477, 484 (Tex. Crim. App. 2004)). A
reviewing court may find the evidence factually insufficient in two ways. Id. First,
when considered by itself, the evidence supporting the verdict may be too weak to
support the finding of guilt beyond a reasonable doubt. Id. Second, after weighing
the evidence supporting the verdict and the evidence contrary to the verdict, the
contrary evidence may be strong enough that the beyond-a-reasonable-doubt standard
could not have been met. Id. In conducting the factual-sufficiency review, we must
employ appropriate deference so that we do not substitute our judgment for that of
the fact finder. Id. Our evaluation should not intrude upon the fact finder's role as the
sole judge of the weight and credibility given to any witness's testimony. Id. (citing
Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997)). In conducting a
factual-sufficiency review, we must discuss the evidence appellant claims is most
important in allegedly undermining the jury's verdict. Id. (citing Sims v. State, 99
S.W.3d 600, 603 (Tex. Crim. App. 2003)). We are authorized to disagree with the
jury's determination even if probative evidence exists which supports the verdict, but
we must avoid substituting our judgment for that of the fact-finder. See Santellan v.
State, 939 S.W.2d 155, 164 (Tex. Crim. App. 1997). 

B. Elements of The Offense

1. In General

 Murder of a child under the age of six is capital murder. Rojas, 171 S.W.3d at
447 (citing McCollister v. State, 933 S.W.2d 170, 172 (Tex. App.-Eastland 1996, no
pet.)). A person commits the offense of capital murder of a child if the person
commits murder as defined under section 19.02(b)(1) and the victim is under six years
of age. Tex. Pen. Code Ann. §§19.02(b)(1), 19.03(a)(8) (Vernon 2003 and Supp.
2006). Under section 19.02, a person commits murder if he, "intentionally or
knowingly causes the death of an individual." Id. § 19.02(b)(1) (Vernon 2003). An
act is committed intentionally when it is the actor's conscious objective or desire to
engage in the conduct which causes the result. Tex. Pen. Code Ann. § 6.03(a)
(Vernon 2003). A person acts knowingly when he knows that the conduct is
reasonably certain to cause the result. Id. § 6.03(b). The plain language of the
statute for capital murder of a child under the age of six does not require appellant to
have intentionally killed the child. Rojas, 171 S.W.3d at 447; see Canedy v. State,
507 S.W.2d 743, 744 (Tex. Crim. App. 1974) (holding that lack of a specific intent
to kill does not render the evidence for murder insufficient). Rather, to find the
accused guilty of capital murder of a child under six years old, he need only have
knowingly killed the child. See Rojas, 171 S.W.3d at 446. 

2. Intent

 Intent is a fact question and may be inferred from circumstantial evidence.
Guevara v. State, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004). A culpable mental
state is almost always proven through circumstantial evidence. Warren v. State, 797
S.W.2d 161, 164 (Tex. App.-Houston [14th Dist.] 1990, pet. ref'd). Intent may be
inferred from acts, words, and conduct of the accused. Hernandez v. State, 819
S.W.2d 806, 810 (Tex. Crim. App. 1991) (en banc); Mouton v. State, 923 S.W.2d
219, 223 (Tex. App.-Houston [14th Dist.] 1996, no pet.). The jury must review all
the evidence and may reasonably conclude from the circumstantial evidence that the
requisite mental state existed. Mouton, 923 S.W.2d at 223. As the State asserts,
the jury may consider the severity of the victim's injuries in determining the
defendant's intent. Patrick v. State, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995)
(en banc). Intent may also be inferred from the extent of the injuries and the relative
size and strength of the parties. Id. at 487. 

3. Identity

 The essential element of identity may be proven by direct or circumstantial
evidence. See Earls v. State, 707 S.W.2d 82, 85 (Tex. Crim. App. 1986) (en banc).

C. Application

 In this case, the evidence must prove that Lozano caused Johnathan's death in
one of the alternate manners and means alleged in the indictment. (7) Lozano asserts
that the evidence is insufficient to prove specific intent to kill and identity. Essentially,
he asserts the evidence shows that the child died as the result of an accident and does
not prove that he delivered the fatal injuries. The State responds that the evidence is
sufficient to prove the essential elements of the offense.

 Viewed in the light most favorable to the verdict, the evidence demonstrates
that, when Lozano was home, the child was kept in his room blocked in by a gate at
the door; two chairs were piled with books and boxes to prevent his exit. When Mrs.
Lozano worked at night, Lozano was alone with the child. She began work in early
December 2001. The child died December 23, 2001. Five days before his death, his
maternal grandmother noticed bruises on his body. At that time, the child was
inconsolable. He was not a fussy child. Lozano admitted that, on December 22,
2001, at approximately 10:30 p.m., he was alone with the child. He allowed the child
to bathe while Lozano shaved. Lozano clipped the child's toenails after the bath,
including the toe with a fresh wound of missing skin. Lozano admitted he may have
nicked the skin. According to Lozano, the child was unclothed when he woke him. 
Sometime during the evening, the child sustained the fresh injury to his groin. Around
1:40 a.m. the following morning, Lozano woke the child, who was unclothed. The
child was "more limp," according to Lozano. By 2:09 a.m., emergency personnel were
administering resuscitation because the child was nonresponsive and not breathing. 
The child was received at the hospital on reports he died at the scene. The child's
mother, who spent the entire day with the child before leaving to work, denied that
he had the fresh bruises on his abdomen, back, toe, and groin when she left for work. 
Three doctors, including the one who performed the autopsy, testified that the two
perforations in the intestine required blunt force trauma, including kicking. One doctor
testified that the tear to the mesentery required an even stronger force than the force
required to tear the intestine. One doctor testified that one bruise on the child's back
was consistent with the shape of a boot. Fresh bruises on the child's abdomen were
consistent with the blunt force necessary to cause the fatal ruptures to the child's
intestines and inconsistent with an accident. Death was caused by blunt force trauma
to the child within the three hours the child was alone with Lozano. Other injuries to
the child were in various stages of healing. We turn to the essential elements of intent
and identity.

 By its verdict, the jury could have inferred that Lozano engaged in systematic
physical abuse of the child during the month after Mrs. Lozano began work and he
remained alone to care for the child. Five days before he died, the child had visible
bruises and was uncharacteristically fussy. Lozano shaved while the child bathed. 
After the bath, Lozano handled the toe that ultimately had a fresh wound of missing
skin. Lozano admitted he could have nicked the toe. The jury could have reasonably
inferred that the instrumentality of the toe wound was the razor Lozano used to shave. 
The jury could have further inferred that the unclothed child suffered the traumatic
injury to his groin before or after the toe injury. Some time during the three hours in
question, Lozano "took his air out." Three blunt force blows were required to cause
the two perforations to the child's intestines and one to his mesentery. The child had
seven significant bruises to his abdomen. Lozano admitted to one accidental injury to
the child's abdomen. However, he changed his testimony from stepping on the child
to jumping on the child. More importantly, he did not report the claimed accident. 
Medical testimony negated accidental injury on various grounds, including the number
of fresh bruises to the child's abdomen. The injuries the child sustained during the
three hour period were not simultaneous but they increased in severity. 

 Further, the jury could have interpreted Lozano's description of the child as
"more limp" as evidence that the child could have been limp at some prior assault as
some injuries were in various stages of healing. The jury could have reasonably
inferred that Lozano's systematic physical abuse began early in the month of death,
grew in intensity throughout the month including throughout the three hours in
question, and culminated in the blows that ended the child's life. Further, the jury
could consider the severity and extent of the injuries that killed the twenty-month old
child. Evidence showed that to tear the child's mesentery, greater force was required
than to tear the intestines. The evidence demonstrated that, to kill the child, "severe"
blows were necessary. The jury could reasonably infer that one tear to the intestine
could have killed the child but it did not; rather, the greater force required to tear the
child's mesentery was delivered and it did. The jury could reasonably find that Lozano
acted with awareness of the potential result of his actions. See Ybarra v. State, 890
S.W.2d 98, 109-10 (Tex. App.-San Antonio 1994, pet. ref'd). The injuries occurred
while Lozano was admittedly alone with the child and the child died from those
injuries. 

D. Disposition

 By its verdict, the jury rejected Lozano's theory of accidental injury and his claim
of innocence. Lozano was aware that he took the child's air out. Viewed in the light
most favorable to the verdict, the evidence demonstrates that he knew his actions
were reasonably certain to result in death. The child's death was not an accident. 
The injuries sustained were knowingly inflicted. Someone kicked or punched the child
with enough force to perforate his intestine in two places and his mesentery. After
reviewing the evidence in support of the verdict, we conclude that the evidence did
support a rational conclusion that Lozano was aware that his conduct was reasonably
certain to result in death. See Escamilla, 143 S.W.3d at 817. We conclude that the
evidence is legally sufficient to prove the essential element of intent. Because the
evidence is legally sufficient to support a conviction for murder of a child under six
years of age, any lack of specific intent to kill a person under six years of age does not
render the evidence legally insufficient to support a conviction for capital murder. See
Rojas, 171 S.W.3d at 447. 

 Contrary evidence demonstrates that Lozano denied hitting the child and denied
killing the child. He first admitted he stepped on the child and later admitted he
jumped on the child. Lozano maintained it was accidental. Based on the number of
bruises and the extent of the fatal injuries, the medical evidence negates accident. We
conclude the evidence is factually sufficient to prove intent. We cannot conclude that
the evidence supporting the verdict is too weak to support the finding of guilt beyond
a reasonable doubt or that the contrary evidence is strong enough that the
beyond-a-reasonable-doubt standard could not have been met. See Zuniga, 144
S.W.3d 484. 

 The evidence also demonstrates that the fatal blows were struck during the
three hours Lozano was alone with the child and the child died within that time. 
Because Lozano was admittedly the only person with the child when the fatal injuries
occurred, we further conclude that the evidence is legally and factually sufficient to
prove identity. See Escamilla, 143 S.W.3d at 817; Zuniga, 144 S.W.3d 484; Earls,
707 S.W.2d at 85. We overrule Lozano's second and third points of error.

III. PROCEEDINGS BEFORE THE JURY

 By his first point of error, Lozano asserts that the trial court's comments in the
jury's presence were calculated to imply that defense counsel was unethical, perhaps
deceitful, and disrespectful. He asserts that the remarks created a hostile environment
that eviscerated any presumption of innocence and benefitted only the State. He
directs us to the record in its entirety. The State responds that the issue is
inadequately briefed and Lozano did not preserve error.

 We construe briefs liberally. See Tex. R. App. P. 38.9. We must address every
issue raised and necessary to final disposition of an appeal. Tex. R. App. P. 47.1. 
Further, to determine harm, we are obligated to examine the entire record in a neutral,
impartial, and even-handed manner and not in the light most favorable to the
prosecution. See Tex. R. App. P. 44.2; Harris v. State, 790 S.W.2d 568, 586 (Tex.
Crim. App. 1989) (en banc) (construing predecessor harmless error rule). (8) Further still,
pursuant to Texas Rule of Evidence 103(d), we are authorized to "take notice of
fundamental errors affecting substantial rights although they were not brought to the
attention of the court." Blue v. State, 41 S.W.3d 129, 131 (Tex. Crim. App. 2000). 
Accordingly, in connection with our legal and factual sufficiency review of the record,
we have also reviewed the trial court's statements in the jury's presence and remained
mindful of Lozano's complaint. Applying these well-settled principles, we are also
mindful that reversal of a conviction is not required unless Lozano can demonstrate
that the claimed hostile environment either affected his substantial rights or deprived
him of a fair trial. See House v. State, 947 S.W.2d 252, 254 (Tex. Crim. App. 1997)
(en banc). 

 The record demonstrates that the trial court (1) reminded defense counsel of the
time limit during opening statement, (2) methodically and decisively ruled on defense
counsel's objections, sustaining more than those denied, (3) gave the jury curative
instructions after sustaining defense counsel's objections, (4) did not impede his
examination or cross-examination of witnesses, (5) allowed him to conduct voir dire
of individual witnesses, (6) disallowed time for defense counsel to make a record but
simultaneously invited him to make the record at another time, (9) (7) admonished both
the prosecutor and defense counsel as to their conduct toward each other and toward
the trial court, (10) (8) responded to defense counsel's questions as to the trial court's
rules, (11) and (9) noted, as requested, his occasional exceptions to evidentiary rulings.
The record also demonstrates a short colloquy (including somewhat strong statements
between defense counsel and the trial court) near the end of the culpability phase of
the trial, when defense counsel requested a ruling on his objection during the cross-examination of Lozano. (12) The prosecutor had asked two questions when defense
counsel objected that Lozano was not allowed to answer. The record demonstrates
that Lozano answered. The trial court overruled the objection stating, "This is cross-examination." Defense counsel raised similar objections and the trial court ruled
accordingly. The trial court responded to defense counsel's statements regarding its
rulings. When Lozano completed his testimony, no similar colloquies between defense
counsel and the trial court occurred. 

 We conclude that the record does not demonstrate error. Further, it has long
been the rule that an appellant cannot create a conflict during the course of a trial and
subsequently complain on appeal of error which he induced. See Prystash v. State,
3 S.W.3d 522, 531 (Tex. Crim. App. 1999) ("Where a party by a request for a ruling
leads the court into error, he should be precluded from claiming a reversal of the
judgment by reason of the error so committed."); Gonzalez v. State, 115 S.W.3d 278,
286 (Tex. App.-Corpus Christi 2003, pet. ref'd). 

 Even assuming error, we conclude that Lozano invited error and, thus, is
estopped from complaining on appeal of an action he induced. See Prystash, 3
S.W.3d at 531. To hold otherwise would be to permit him to take advantage of his
own wrong. Id. Further, the colloquies addressed above occurred near the end of the
trial. Thus, we further conclude that the record does not demonstrate reversible error. 
See Tex. R. App. P. 44.2; Gonzalez, 115 S.W.3d at 285-86 ("Yet there was no time
for the harmful impact of these statements to be attenuated over the course of the
trial or sentencing hearing."). We overrule Lozano's first point of error.

IV. CONCLUSION

 Because we overrule Lozano's three points of error, we affirm the judgment. ERRLINDA CASTILLO

 Justice

Do Not Publish.

Tex. R. App. P. 47.2(b).


Memorandum Opinion delivered and filed

this 26th day of October, 2006.

 
1. See Tex. R. App. P. 47.2, 47.4. 
2. The indictment alleged that, on or about December 23, 2001, Lozano caused the death of a
child, Johnathan Cate, by striking him with an unknown object, stepping on him with his foot, kicking
him with his foot, striking him with his hand, or an unknown means. See Tex. Pen. Code Ann. §
19.03(a)(8) (Vernon Supp. 2006) (a person commits an offense if he murders a child under the age of
six years). 
3. The child had bite marks above the groin and an injury to the groin. 
4. The child's toe was missing skin. The injury was described as fresh. 
5. The two married after the child's death. 
6. Testimony from investigators and emergency personnel, and records admitted in evidence,
show Johnathan died at the scene. 
7. See note 1.
8. Any "error, defect, irregularity, or variance" other than constitutional error "that does not affect
substantial rights must be disregarded." Tex. R. App. P. 44.2(b). A substantial right is affected "when
the error has a substantial and injurious effect or influence in determining the jury's verdict." Rich v.
State, 160 S.W.3d 575, 577 (Tex. Crim. App. 2005) (citing Russell v. State, 155 S.W.3d 176, 179
(Tex. Crim. App. 2005)) (en banc); Morales v. State, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000);
accord, King v. State, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). In evaluating harm, the appellate
court should consider everything in the record. Rich, 160 S.W.3d at 577; Bagheri v. State, 119 S.W.3d
755, 763 (Tex. Crim. App. 2003). It is the responsibility of the appellate court to assess harm after
reviewing the record, and the burden to demonstrate whether the appellant was harmed by a trial court
error does not rest on the appellant or the State. Johnson v. State, 43 S.W.3d 1, 5 (Tex. Crim. App.
2001) (en banc).

 

 We consider everything in the record, including any testimony or physical evidence admitted for
the jury's consideration, the nature of the evidence supporting the verdict, the character of the error and
how it might be considered in connection with other evidence in the case, the jury instruction given by
the trial judge, the State's theory and any defensive theories, closing arguments, and voir dire if material
to appellant's claim. Morales, 32 S.W.3d at 867. We also consider overwhelming evidence of guilt,
but that is only one factor in our harm analysis. Motilla v. State, 78 S.W.3d 352, 356-58 (Tex. Crim.
App. 2002).
9. Lozano did not make a formal bill of exception or an offer of proof. See Tex. R. App. P. 33.2
and Castillo v. State, 939 S.W.2d 754, 758 (Tex. App.-Houston [14th Dist.] 1997, pet. ref'd). 
10. At one point, the trial court stated, "Please do not argue with the Court or with each other." 
11. Defense counsel asked about, and the trial court responded as to, a possible fine for counsel
"talking over each other." 
12. We acknowledge zeal in advocacy. See Metzger v. Sebek, 892 S.W.2d 20, 38-39 (Tex.
App.-Houston [1st Dist.] 1994, writ denied) (stating that lawyers not only have the responsibility to
conduct themselves with respect for the tribunal and legal system but also must eschew behavior likely
to invoke proper admonishment). This is no less true for those representing the State in a criminal
prosecution. See State ex rel. Eidson v. Edwards, 793 S.W.2d 1, 6-7 (Tex. Crim. App. 1990) (original
proceeding). We likewise acknowledge the trial court's discretion to control the court proceedings. Blue
v. State, 41 S.W.3d 129, 132 (Tex. Crim. App. 2000); see Metzger, 892 S.W.2d at 37-39.